The Chief Justice
delivered the opinion of the Court:
This is an action at law. The first count in the declaration is as follows:
“The plaintiff sues the defendant, a corporation duly incorporated by an act of the Congress of the United States, having its habitat and place of business in the city of Washington, in the District of Columbia; for that whereas the defendant, to wit, on or about the 9th day of February, A. D. 1889, was and still is, the owner and manager of a large market house in the said city of Washington and District of Columbia, in the upper portion of which the defendant, *299 at the time aforesaid, kept and maintained, and still keeps and maintains, large apartments for cold storage of meats and other merchandise vended at said market house; also at the time aforesaid, the defendant kept, maintained and managed, and still keeps, maintains and manages, certain elevators used for the purpose of hoisting and lowering said meats and other merchandise in connection therewith.
“ And certain. servants and agents of the defendant had the management and care of, and were operating by hydraulic pressure, one of said elevators, at the time aforesaid; yet the defendant not minding or regarding its duty in this behalf, took so little and so bad care in the operation of the said elevator, that by and through the gross negligence, carelessness and mismanagement of the defendant and its said servants and agents, and for want of due diligence and proper care of the defendant and its said servants and agents, left open, unguarded, unprotected and with no light burning to disclose the dangerous pitfall beneath, the doorway leading into said elevator on the ground floor. And, in the darkness of the night, the plaintiff innocently mistaking the said doorway as conducting into one of the defendant’s water-closets, fell headlong into and down the said dangerous pitfall, a distance of about four feet, upon the iron shaft, piston and machinery used by the defendant and its said servants and agents in operating said elevator; and the plaintiff became thereby and was greatly injured, bruised, hurt,” &c.
The second count in the declaration is precisely the same as the first, except that there is an allegation of special damage. .
General issue was pleaded to this declaration, issue joined and trial had. The plaintiff offered evidence to sustain the declaration and his cause of action. At the conclusion of his evidence, the defendant moved the court to instruct the jury to return a verdict for the defendant, which motion was sustained by the court, and judgment was entered for defendant.
To this action of the court an exception was taken, and a *300 bill of exceptions prepared and signed by the justice presiding. I read from, the bill of exceptions:
“The plaintiff, to maintain the issue on his part joined, offered evidence tending to show that on the we.st side of the Seventh street wing of the market building, in the court or yard of the defendant, outside said market building, there was, and is, a sidewalk from ten to twelve feet wide, leading to double folding-doors opening into the main or central portion of the market house; that at the angle formed by the intersection of the west wall of the Seventh street wing arid the north wall of the main or central portion of the market house the defendant then had, and was operating an elevator; that the walls of the shaft or well-hole of the elevator were formed on the east by the west wall of the Seventh street wing, on the south by the north wall of the central or main portion of the building, and on the north by a brick wall projected from the west wall of the Seventh street wing, and on the west by a wall connecting this wall with the north wall of the main or central building, with an opening four or five feet wide as a door leading into the elevator shaft; that the walls as thus constructed of the elevator shaft extended about half-way across the sidewalk on the west side of the Seventh street wing; that the car of the elevator was operated by hydraulic pressure, and ran up and down flush with the walls of the elevator shaft or well-hole; that said well-hole or shaft was about four'feet deep below 'the pavement, and in the center thereof was the iron piston used in operating the car of the elevator; that this shaft-hole was in close proximity to the folding-doors mentioned, and the outer edge of it was distant from the sidewalk by the thickness only of the wall of the elevator shaft; that four bolts, at the bottom of 'the shaft, projected about three inches each above the nut that comes on the top" of the cylinder, and that this elevator was used by the defendant in connection with its cold storage overhead, and was outside its market building.
“And the plaintiff, being sworn, testified in his own be *301 half, that he is fifty-four years of age, by trade a blacksmith, and employed in the navy yard; that on the 9th of February, 1889, he had been to Mr. Redman’s store, on Ninth street northwest, to pay a bill; that on his way back he came through the market house, and went over to Mr. Johansen’s restaurant, and met there Mr. Belt, Jr., and Mr. Indamauer; that then they — all three — went over to the market house, and while standing there talking, Mr. Belt, Sr., came up; that in the meantime he asked Mr. Indamauer where the water-closet was; that the latter, pointing the way, told him to go out that door; that he went out there into the courtyard, stood awhile, he thought about two minutes; but it was very dark, and the first place that looked to him like a water-closet was a dark opening, and he walked right into it; that he made a grab at something when he found that he was going, and that he must have turned over and cut his head and struck his left knee against something in the bottom of this pit; that he had no idea how deep the pit was; that he had not seen it since, and was never there before; that he believed he was knocked senseless, and did not exactly remember how he got out. When he found himself he was outside, though coming into the door; that when he came out of the pit the elevator was up, and he did not know what prevented it from coming down on him; that he is not conscious that he made any outcry; that from there he went right into the market where these gentlemen were standing; that they took him across the street and had his head washed, and from there Mr. Indamauer took him to Gilman’s drug store, and his head was dressed; that he and Mr. Indamauer thence returned to Johansen’s restaurant, and from there they went over to the market house office, upstairs, to see about the matter, but the Governor was not there; and in answer to questions by his attorney, the plaintiff further testified that there was no light at the elevator, and he stepped right into the hole; that there was no light at all there or anywhere in the yard; that the result of his injury was that he got hurt yery bad; that he got his knee *302 mashed up, and a cut two and a half inches long on his head; that he was laid up for fifteen days, and was attended by Dr. Adams, now deceased, who visited him eleven times; that his bill was $25, and he was put to other expenses for medicines; that he receives a per diem salary of $3.04; that his main injury was to his knee, but that it did not seem to bother him so much as the head injury until the next morning, when he could not lift it out of bed at all, it was so swollen; that he then sent for the doctor, who attended him for fifteen days, and that the doctor said it was a terrible wrench or sprain of the knee; that he still feels the effects of this injury all the time, and particularly in cloudy weather. And on cross-examination the plaintiff testified that for two weeks after he returned to his work in the Navy Yard he was allowed to sit down, and that he did not for this time do any hammering; that at the time of the injury about eight o’clock in the evening, the market inside was brightly lighted, and there were many persons in thére doing their marketing; that he himself was not in there for the purpose of buying anything or attending to any business. He was there only with his friends; that when he inquired for the water-closet, Indamauer said, “ Go right out that door; there you will find it”; that he had no other guide for his direction; that he was never there before; that the yard was very dark, and no other person was out there as far as he saw; that he saw the dark opening, looking like a doorway, and as it looked more like the entrance to a water-closet than anything else he saw, he walked into it; that he had taken a drink of whiskey at Redman’s about six o’clock of that evening, and, a short time before the accident, he had taken another drink of whiskey at Johansen’s restaurant, and that that was all he had drank that day, and that he was perfectly sober.
“ Other evidence was adduced by the plaintiff tending to show that the cross-bar that the defendant had theretofore used to prevent accidents at the elevator was broken, and that there was at the time of the accident no light nor any barrier in front of the opening to the elevator shaft.
*303 “The above is all the evidence that is material to the plaintiff’s right to recover of the defendant for the alleged injury. And thereupon the plaintiff rested.”
It is claimed by counsel for the plaintiff that this evidence was sufficient not only to show that the defendant was negligent, but that the plaintiff was not guilty of contributory negligence; that is to say, that there was no showing of contributory negligence; and inasmuch as the law of this jurisdiction is that the burden of showing contributory negligence is on the defendant, therefore the court was not authorized to sustain the motion of the defendant to direct a verdict for the defendant.
Counsel for the defendant base their support of the judgment obtained in the court below upon two propositions: first, the plaintiff’s own testimony proved him guilty of contributory negligence; second, neither the declaration nor the proof showed the violation by the defendant of any duty to the plaintiff.
Quite a number of authorities are cited by counsel for the defendant in support of their second proposition, which I will first notice. The authorities cited are in effect that the party who goes uninvited onto the premises of another, and without having any business to transact with the owner or occupant'of the premises, is to be regarded either as a trespasser, or as a mere licensee; and in either case the owner of the property owes no duty whatever to such a party; that the party who is a trespasser or who is a mere licensee takes the risk upon himself of going upon the premises of another, and the owner would only be liable in case of some willful injury, such as secretly depositing spring guns where they could not be seen, in a place likely to be traveled over by a stranger, who might be a trespasser, or pitfalls similarly concealed. In such a case as that, it is conceded that the owner of the premises would.be liable, because there the injury' is willful. The purpose and object of the owner of the premises in creating these dangerous places, or depositing dangerous weapons, liable to *304 be discharged by a person stepping on them, is willful and wicked. We are of the opinion that it is not necessary for us to base the decision of this case upon the doctrine of the second proposition made by the defendant. The cases are apparently not all uniform. A great deal of discrimination has been made by the different courts, depending, perhaps, after all, more upon the variation and difference between the particular circumstances under which' the accident happened, and the injury was received, than upon any real difference in principle.
A case of this character ought, if it can be, to be determined more upon its substantial merits and upon the well known and well established principles of law. Nothing is better established than that the party who is himself guilty of negligence which contributes directly to the injury which he receives, and is not the remote but the proximate cause of the injury, cannot recover from a party who may also be guilty of negligence which is also the proximate cause of the injmy. It is said by counsel for the plaintiff that this is not a case of contributory negligence. I do not recall any special explanation that was given by counsel for that proposition; but the case of Isbell vs. The N. Y. & N. H. R. R. Co., 27 Conn., 393, is cited by counsel, and it is insisted it is a case full of instruction upon all the points of this case, and the court were especially solicited to examine it. We find it to be a case; however, that is not applicable really to the present case. The circumstances are entirely different. It was a case where the plaintiff sought to recover damages for injury by a railroad train to animals belonging to the plaintiff that had strayed upon the track; and the question arose there in regard to the liability of a railroad company in such a case, where the owner of the animals claimed to have enclosed and confined them in an enclosure, and they had escaped from the enclosure and entered the highway, and thereafter strayed upon the track, and the train, coming along, injured them. It was quite early held, sometime before the decision in this case, that *305 in such a case as that it must'be ascertained that the negligence of the owner of the animals was the proximate cause, and that the injury must have been the direct result of the negligence of the owner of the animals. Where the negligence of the plaintiff was only the remote cause of the injury, such, for instance, as confining them within an enclosure without a sufficient or lawful fence around the enclosure, that was held to be such a remote cause that if the animals escaped from the enclosure and strayed upon the railroad track, then the railroad company would be liable for damages for injury resulting, if it appeared in the evidence that the train, by the exercise of due diligence, might have been stopped, so as to prevent the injury, and that is true, notwithstanding the plaintiff may have had his cattle in an enclosure with an insufficient .fence.
That is the substance of this case. The case is a very learned one, and very satisfactory upon that subject; but it does not reflect upon the present case.
The question of contributory negligence, we think, arises in this case beyond all question; and it is undoubtedly true, we think, that the evidence introduced by the plaintiff shows, upon a careful consideration of it, that he was himself guilty of negligence, and that even if it be conceded the defendant itself was also guilty of negligence, the plaintiff cannot recover.
The plaintiff was bound to exercise care and prudence in going into this place. The care required of one under such circumstances has been very well expressed by the court in the case of Beers vs. Housatonic R. R. Co., 19 Conn., 566, as follows:
“ The care required of the plaintiff is that degree of care which may reasonably be expected from one in his situation. What will be deemed reasonable care in any case will depend on the particular circumstances of that particular case.”
Of course the reasonable care that is to be exercised here is such reasonable care as a prudent person should exercise *306 under the same circumstances; not the care which might be exercised by a careless person, but by a prudent person.
The plaintiff, in the evidence given by himself in this case, states that he had never been in this place before; that is, in this court-yard, I understand him to mean. He probably had been in the market house. He says that when he went out he stopped for a minute or two, he thinks, for the purpose of looking around; that it was very dark; that there was a sidewalk there. I may say here that whether this was a sidewalk that belonged simply to the market house company for the use of their employees, or whether it was one that was used by the public at any time in the day-time or at night, does not appear from this evidence. Counsel, in their argument, say that people were at times at least in the habit of passing and repassing along this sidewalk to go into the central market; but that does not appear in the evidence. It only appears that there was a pavement of about a certain width, which the witness called a sidewalk. He says that he saw no person about there that night; that there were no lights there anywhere; that it was very dark; that he looked about and he saw a place that looked to him more like a water-closet or the opening for a water-closet than any other place that he saw around, and assuming that it was the water-closet, he walks to it and walks right into it without stopping to make any investigation, as he might have made, even if it was dark. He had the sense of feeling left to him, and if it was difficult to tell by sight what it was, he could have determined what this opening was, whether it was a pit, as it turned out to be, or whether it was a place such as he was desirous of going into; but he did not do that.
It seems to us that the plaintiff ought to have been admonished by a number of circumstances there to exercise caution in regard to the place that he went into. First, he had no specific direction, as he says. The only direction was to pass out of the market house through a door. Beyond that he had no direction where to go or a description *307 of the place into which' he was to go. After that, when he gets into the court-yard, he finds that it is very dark; that he is in a place he never was in before, and that he knows nothing about it. He says, too, that it is a place that, whatever use was made of it at any time, was not being used by anybody at that time, for there was no light in there.
Next, he says he saw a small opening into some place that was dark, and we think he should have been put upon his caution by all these circumstances, not to have rushed heedlessly and thoughtlessly into a place of that character without some examination himself or without making some further inquiry in regard to the place he was desirous of visiting. There was no evidence in the case that there were any water-closets connected with this market, and no evidence that there was any water-closet in the vicinity of this place where the plaintiff fell. He was not directed to go there by any person connected with the defendant or by any employee or servant of the market house company.
It seems to us that the plaintiff was guilty of gross carelessness according to his own statement, in going into this place where he did. It is an exceedingly unfortunate thing for him, but it would seem to be principally, at least, his own carelessness. He should not have gone or attempted to go in any place there under the circumstances which he states in his evidence. No prudent person would do so. It may be — indeed, for the purpose of passing upon this question we assume — that the defendant was also guilty of carelessness. In reference to the plaintiff himself, as to whether he was a mere licensee or whether he had a right to go into the market house as a public place, and had a right to presume that the defendant would exercise the proper care as to protecting persons who might go there from falling into places of this character — assuming all that, yet under the particular circumstances that the plaintiff in his own testimony develops, we think that it shows conclusively that he was guilty of gross negligence, but for which he would not have received this injury, or at least that it directly con *308 tributed to his receiving the injury. That being true, it is entirely proper that the court should instruct the jury to return a verdict for the defendant, and it is proper that we should sustain the motion to permit a verdict to be entered for the defendant.
There is abundant authority for that in the decisions of the Supreme Court of the United States, cited by counsel for plaintiff in their brief. Mr. Justice Harlan, in a recent case, says:
“Undoubtedly, questions of negligence in actions like the present one are ordinarily for the jury, under proper directions as to the principles of law by which they should be controlled. But it is well 'settled that the court may withdraw a case from them altogether and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it.” Citing Phoenix Ins. Co. vs. Doster, 106 U. S., 30; Griggs vs. Houston, 104 U. S., 553; Randall vs. B. & O. R. R. Co., 109 U. S., 478, 482; Anderson County Commissioners vs. Beal, 113 U. S., 227, 241; Schofield vs. Chicago & St. Paul R. W. Co., 114 U. S., 615, 618.
“‘It would be an idle proceeding,’ this court said, in North Penn. R. R. Co. vs. Commercial Bank, 123 U. S., 727, 733, ‘to submit the evidence to the jury when they should justly find only one way.’ ” Del., Lack. & West. R. R. vs. Converse, 139 U. S., 472.

The judgment of the Circuit Court will be affirmed.